**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tamela Joy Chavez, | No. CV-13-00545-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Tamela Joy Chavez seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

I.     **BACKGROUND**

   A.     **Factual Background**

Plaintiff was born in August 1967.  She has a ninth grade education and is able to communicate in English.  Her past work includes retail sales clerk, customer service representative, and cake decorator.  She has had full surgical knee replacement of both knees, the left in December 2008 and the right in August 2009.  She alleges continued

pain in her knees as well as back pain.  In addition, she suffers from depression and anxiety.

### B.     Procedural History

On June 7, 2011, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability beginning May 15, 2009.  On September 5, 2012, she appeared with her attorney and testified at a hearing before the ALJ.  A vocational expert also testified.

On October 5, 2012, the ALJ issued a decision that Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied Plaintiff's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision.  On March 15, 2013, Plaintiff sought review by this Court.

## II.     STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision.[1]  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole.  *Id.*  In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence."  *Id.*  As a general rule, "[w]here the evidence is susceptible to more than one rational

---

[1] In footnote 3 in her Opening Brief, Plaintiff states that the ALJ failed to address the requirements of Social Security Ruling 02-1p regarding obesity, but she does not raise this as an issue for judicial review, she has not alleged any functional limitation resulting from obesity, and the evidence of record does not show any limitation related to obesity.

1   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be
2   upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

3   **III.   FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

4          To determine whether a claimant is disabled for purposes of the Social Security
5   Act, the ALJ follows a five-step process.  20 C.F.R. § 404.1520(a).  The claimant bears
6   the burden of proof on the first four steps, but the burden shifts to the Commissioner at
7   step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

8          At the first step, the ALJ determines whether the claimant is engaging in
9   substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If so, the claimant is not
10  disabled and the inquiry ends.  *Id.*  At step two, the ALJ determines whether the claimant
11  has a "severe" medically determinable physical or mental impairment.
12  § 404.1520(a)(4)(ii).  If not, the claimant is not disabled and the inquiry ends.  *Id.*  At step
13  three, the ALJ considers whether the claimant's impairment or combination of
14  impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P
15  of 20 C.F.R. Pt. 404.  § 404.1520(a)(4)(iii).  If so, the claimant is automatically found to
16  be disabled.  *Id.*  If not, the ALJ proceeds to step four.  At step four, the ALJ assesses the
17  claimant's residual functional capacity and determines whether the claimant is still
18  capable of performing past relevant work.  § 404.1520(a)(4)(iv).  If so, the claimant is not
19  disabled and the inquiry ends.  *Id.*  If not, the ALJ proceeds to the fifth and final step,
20  where he determines whether the claimant can perform any other work based on the
21  claimant's residual functional capacity, age, education, and work experience.
22  § 404.1520(a)(4)(v).  If so, the claimant is not disabled.  *Id.*  If not, the claimant is
23  disabled.  *Id.*

24         At step one, the ALJ found that Plaintiff meets the insured status requirements of
25  the Social Security Act through September 30, 2011, and that she has not engaged in
26  substantial gainful activity since May 15, 2009.  At step two, the ALJ found that Plaintiff
27  has the following severe impairments:   chronic obstructive pulmonary disorder
28  ("COPD"), degenerative disc disease, peripheral neuropathy, obesity, status post bilateral

knee replacement, a hypothyroid disorder, status post partial thyroidectomy, an affective disorder, and an anxiety disorder.  At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Plaintiff:

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can never climb ladders, ropes and scaffolds.  The claimant can occasionally climb ramps and stairs, and can occasionally stoop and crouch.  The claimant can never kneel and crawl.  She should avoid concentrated exposure to the use of moving machinery, except for motor vehicles.  She should also avoid concentrated exposure to unprotected heights.  She should avoid irritants such as fumes, odors, dusts and gases.  The claimant is further limited to performing simple, unskilled work.  As well, she should work in a low-stress job, described as having only occasional changes in the work setting.

The ALJ further found that Plaintiff is unable to perform any of her past relevant work. At step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

## IV.   ANALYSIS

### A.   The ALJ Did Not Err in Weighing Medical Source Evidence.

#### 1.   Legal Standard

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians:  (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results.  *Id.* at 832-33.  Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians.  *Id.* at 830.  Where a treating physician's opinion is not contradicted by another physician, it

may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*; *Orn*, 495 F.3d at 632 (where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record).

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician.  *Lester*, 81 F.3d at 830.  As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id.* at 831.  "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957.

Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Orn*, 495 F.3d at 631.  The ALJ need not accept the opinion of any physician if it is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957.  The ALJ may discount a physician's opinion that is based only the claimant's subjective complaints without objective evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

Moreover, Social Security Rules expressly require a treating source's opinion on an issue of a claimant's impairment be given controlling weight if it is well-supported by

- 5 -

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.   20 C.F.R. § 404.1527(d)(2).   If a treating source's opinion is not given controlling weight, the weight that it will be given is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors.   *Id.*

### 2.        Afeworki Kidane, D.O., Treating Physician

On August 13, 2012, Dr. Kidane provided a Medical Assessment of Ability to Do Work-Related Physical Activities based on Plaintiff's condition on or before September 30, 2011, her date last insured.   He stated that the impairments affecting Plaintiff's ability to function are low back pain, hypertension, degenerative joint disease, and bulging lumbar disc.   He did not mention Plaintiff's knees.

Dr. Kidane opined that Plaintiff can sit less than 2 hours and stand/walk less than 2 hours in an 8-hour workday.   He further opined that it is medically necessary for Plaintiff to alternate between sitting, standing, or walking every 1 – 20 minutes with 15+ minutes of rest with position changes.   He opined she can only lift and carry less than 10 pounds. Dr. Kidane indicated Plaintiff can bend, reach, stoop, and use either her right foot or hand less than occasionally, *i.e.*, 0% – 20% of an 8-hour day.   He indicated she can use her left hand occasionally, *i.e.*, 21% – 33% of an 8-hour day, and her left foot frequently, *i.e.*, 34% – 66% of an 8-hour day.   Regarding whether Plaintiff would miss time from work due to her medical condition, Dr. Kidane checked "No," but then indicated she would miss 6+ days per month.

The ALJ stated the following reasons for not giving Dr. Kidane's opinion significant weight:  (1) the length of the treatment relationship was short, (2) the opinion was not supported by the objective medical records, and (3) the opinion was not supported by Dr. Kidane's own treatment records.   Dr. Kidane first saw Plaintiff on April 28, 2012, and then saw her for monthly follow-up visits in May, June, July, and

August 2012.   Therefore, at the time of providing the assessment, the treatment relationship was three and a half months long and involved five office visits.

As an example of the conflict between Dr. Kidane's assessment and the objective medical records, the ALJ stated that Dr. Kidane opined that Plaintiff can only lift or carry less than 10 pounds, but the August 2012 x-ray of Plaintiff's thoracic spine showed only mild hypertropic change, and the June 2011 MRI tests showed mild disc bulging in the lumbar spine, a very small central disc protrusion in the cervical spine,[2] and a partial disc desiccation at the T7-8 level with an otherwise intact and unremarkable thoracic spine. Plaintiff contends the ALJ overlooked other objective evidence, but her record citations do not support Dr. Kidane's assessment.   For example, Plaintiff refers to evidence that shows she had knee replacement surgeries but not ongoing impairment after the surgeries.   Similarly, she cites a December 2011 treatment note by a pain management physician that says she has an antalgic gait, but it also states she is able to sit, stand, and walk without difficulty.   She cites a September 2011 treatment note by a rheumatologist that says her gait is appropriate for her age, proximal and distal strength in the upper and lower extremities is grossly intact, and she indicated tenderness on palpation of the hips, lower back, and right ankle.   It does not support Dr. Kidane's opinion.

The ALJ further observed that the manipulative limitations, *i.e.*, limitations in her ability to use her hands, found by Dr. Kidane are not supported by any objective medical evidence.   Plaintiff does not identify any objective evidence supporting Dr. Kidane's opinion that she is limited in her ability to use her hands.

As an example of the conflict between Dr. Kidane's assessment and his own treatment records, the ALJ stated that while Dr. Kidane reports that Plaintiff suffers from moderate headaches, he did not record any headaches while treating her.   Dr. Kidane's

---

[2] The MRI report describes the cervical disc protrusion as "tiny" and measuring 3 millimeters at its greatest dimension.

- 7 -

treatment notes show little more than Plaintiff sought evaluation of low back pain and prescription refills.

Thus, the ALJ provided clear, convincing, specific, and legitimate reasons supported by substantial evidence for not giving Dr. Kidane's opinion significant weight.

### 3. Sharon Steingard, D.O., and Ronn Lavit, Ph.D., Consulting Psychiatric Examiners

On February 15, 2012, Dr. Steingard conducted a psychiatric evaluation of Plaintiff. She relied on information she obtained by interviewing Plaintiff and from a psychological evaluation prepared by Ronn Lavit, Ph.D., dated September 12, 2011. Plaintiff contends the ALJ erred by not giving significant weight to Dr. Steingard's opinion and by giving greater weight to Dr. Lavit's opinion.

On September 11, 2011, Dr. Lavit interviewed Plaintiff and performed a mental examination. On September 12, 2011, he reported the information he had obtained and his psychological findings. Plaintiff told Dr. Lavit she bakes cakes and cupcakes for family members about 4 times a week, cooks and bakes for family gatherings often, enjoys watching television and cooking shows, enjoys being with family members, goes to church 3 – 4 times a month, and goes grocery shopping once or twice a month using the store's scooter. She reported taking daily naps up to 1.5 – 2 hours. Plaintiff said she has anxiety and panic attacks 4 – 5 times a week because of her medical problems and she began having depression after her heart attack when she was 41 years old.[3] She said she did not like the way Xanax made her feel. She reported having good memory and concentration unless she is in pain, but also reported being "always in pain." She reported alcohol and methamphetamine dependence in remission and that her current medications include oxycodone, morphine, and Xanax. She denied having mental health treatment or counseling. She also said that she left her last job in May 2009 due to the firm not paying her. When tested for attention, memory, and concentration, Plaintiff scored 30 out of 30. She was able to correctly spell "world" backwards.

---

[3] Plaintiff's medical record does not include evidence regarding a heart attack.

Dr. Lavit provided a Psychological/Psychiatric Medical Source Statement in which he opined that Plaintiff has no limitations to understanding and remembering simple or complex instructions or work-like procedures.  He opined that her ability to sustain a normal routine is not limited and that her ability to get along well with co-workers, respond appropriately to supervision, and maintain socially appropriate behavior is not impaired.  Dr. Lavit identified only one limitation:  "At present, she may have limitations in her ability to respond appropriately to heightened changes/stress in the work place due to anxiety and panic attacks."

On February 15, 2012, Dr. Steingard interviewed Plaintiff and performed a mental examination.  Dr. Steingard also reviewed the psychological evaluation prepared by Dr. Lavit and concluded that Plaintiff "appears to have had a psychiatric decompensation since that evaluation."  On February 27, 2012, Dr. Steingard reported that Plaintiff believes she cannot work because of "my whole body."  Further, Plaintiff said her depression has worsened over time, sometimes she will nap for 1.5 – 2 hours a day, she completely stopped going to church, and now she has panic attacks every day.  Plaintiff told Dr. Steingard she is much less social now and is having trouble getting along with her unemployed 20-year-old daughter with whom she lives, but Dr. Steingard described Plaintiff as interacting "in a friendly, trustful, and cooperative manner."

Plaintiff said she was taking Lexapro but it was discontinued because of the side effects, and she never filled her prescription for Prozac because she lost her insurance.  She said she continues to fill her prescriptions for oxycodone and morphine and occasionally takes Xanax when her anxiety is particularly bad.  Dr. Steingard reported that Plaintiff "is now off of most of her medications including her psychotropic medications, and she reports depression has worsened in the last few months."  But it appears that the only antidepressant she had been prescribed was Lexapro.

When tested for attention, memory, and concentration, Plaintiff scored 27 out of 30.  It was very hard for her to spell a word backwards, and she did it very slowly and

1    deliberately.  Dr. Steingard reported:  "Mental status examination is notable for her sad,

2    depressed mood.  She was tearful and crying nearly the whole interview."

3         Dr. Steingard provided a Psychological/Psychiatric Medical Source Statement in

4    which she opined that Plaintiff's limitations "appear to have developed in response to

5    chronic medical problems," Plaintiff "is not now taking most of her medications," and "a

6    spontaneous remission is unlikely."  Dr. Steingard further opined that Plaintiff "appears

7    capable of understanding simple and moderately complicated directions."  Although

8    Plaintiff demonstrated adequate concentration over the course of the interview, Dr.

9    Steingard predicted that Plaintiff's persistence and concentration would be negatively

10   affected by depression over the course of the full work day and work week.  Finding

11   Plaintiff's description of episodes of panic to be credible, Dr. Steingard predicted that

12   Plaintiff would have difficulty concentrating and carrying out tasks during panic attacks.

13   Dr. Steingard found Plaintiff's social interaction to be limited because of her constant

14   crying during the interview and anticipated that her ability to adapt to change would be

15   impaired because of problems with stress.  In other words, based on what Plaintiff told

16   her and Plaintiff's constant crying during the interview, Dr. Steingard concluded that

17   Plaintiff's mental condition had deteriorated significantly between September 11, 2011,

18   and February 15, 2012, and opined regarding how Plaintiff would function in the future

19   during periods of stress, despite Plaintiff's alleged onset of disability on May 15, 2009,

20   and last date insured of September 30, 2011.

21        The ALJ stated he gave Dr. Lavit's opinion "great weight as it is supported by

22   objective medical evidence."  The ALJ identified specific objective results from Dr.

23   Lavit's examination, such as Plaintiff scored 30 out of 30 on a mini-mental status

24   examination, was able to recall dates and events, and did not need questions to be

25   repeated.  Further, the record showed Plaintiff had not received mental health treatment

26   or counseling and that in August 2009, shortly after her right knee replacement, she

27   described her activity level as very active.

28

The ALJ stated he was unable to assign significant weight to Dr. Steingard's opinion because it was based on Plaintiff's subjective complaints, not supported by Dr. Steingard's own objective clinical findings, contradicted by the state agency opinions, and inconsistent with statements Plaintiff made to Dr. Steingard.   These reasons are supported by substantial evidence of record.

In addition, Plaintiff incorrectly states the ALJ failed to explain why the residual functional capacity assessment does not include limitations based on Dr. Lavit's opinion that Plaintiff may have limitation in her ability to respond appropriately to heightened changes/stress in the workplace secondary to anxiety and panic attacks.   In fact, the residual functional capacity assessment expressly states that Plaintiff "should work in a low-stress job, described as having only occasional changes in the work setting."

Therefore, the ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion.

**B.   The ALJ Did Not Err in Evaluating Plaintiff's Credibility.**

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis:   (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

First, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.   Second, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment.

On September 5, 2012, Plaintiff testified that she has severe impairments in her hands, feet, back, and knees, and additional pain in her hips and neck.  She said she had been walking with a cane for a little more than a year and that she needs the cane to maintain balance.[4]  She testified that the pain in her neck travels down her arms and her arms and hands go numb, causing difficulty holding objects and writing.  She also said she gets headaches a couple of times a week, and 2 or 3 times a month the headaches last for 2 or 3 days.  Plaintiff testified that to relieve pain she takes medication and tries to not put weight on the body part that hurts, *e.g.*, she sits if her legs hurt.  She also said generally she can sit for only 5 – 15 minutes and stand for only 3 – 5 minutes before changing positions.  She testified that she can walk to the mailbox, but needs to stop and rest on the way back.  The heaviest weight she said she could lift is about 5 – 10 pounds.  On a scale of 1 – 10, Plaintiff rated her pain the day of the administrative hearing as an 8, with pain medications.

On September 5, 2012, Plaintiff was living with her aunt, uncle, grandmother, and adult daughter.  She had previously lived with and taken care of her grandmother for ten years, but within the past year they had moved in with her aunt and uncle because it began to become more difficult for them "to take care of each other," such as cooking and laundry.  Regarding daily activities, Plaintiff testified that she has fallen in the shower a few times, so tries to wash without showering.  She said she no longer cooks or vacuums, but she is able to do some household chores such as light dusting.  She goes to the grocery store, if accompanied, and uses a scooter inside the store.  She said that she had slight problems with short-term memory, but not with long-term memory, and she has difficulty concentrating.

Plaintiff testified that she had not had health insurance for more than a year and therefore was unable to see medical specialists for her headaches and COPD, a psychologist for her depression and panic attacks, or a neurologist for the numbness in

---

[4] The record does not show that any medical provider prescribed a cane.

her arms and hands.  She also said that she was going to be prescribed Prozac for her depression, but she did not begin taking it because she lost her insurance.  She previously took Xanax for panic attacks.  During the hearing, Plaintiff mentioned that she had a heart attack in August 2008, but she does not allege any related impairment, nor do the medical records show evidence of a heart attack.

After reviewing the objective medical evidence and concluding it did not indicate that Plaintiff's impairments are disabling, the ALJ assessed Plaintiff's credibility.  The ALJ concluded that Plaintiff's testimony lacked credibility to the extent Plaintiff contended that she is unable to perform sedentary work with the limitations included in the residual functional capacity assessment based on the objective medical evidence, medical source opinion evidence, her lack of treatment and/or compliance with treatment and medication orders, and her reported decrease in pain because of surgeries, injections, and pain medications.

The ALJ noted that Plaintiff had been discharged from his practice by Dr. Bucholz because of multiple "no shows" for appointments and she had been noncompliant with medications and treatment multiple times with different doctors.  The ALJ further noted that Plaintiff had a remote history of drug, alcohol, and methamphetamine abuse, more recently had engaged in narcotic seeking behavior, and had made inconsistent reports regarding smoking.

The ALJ also found Plaintiff's testimony regarding her symptoms of depression to be vague and noted that she had not sought mental health treatment.  Plaintiff contends she consistently received mental health treatment in the form of medication.  She also contends that she did not seek mental health treatment because she lost her medical insurance, but did not explain why she did not seek mental health treatment in the years before she lost her medical insurance or how she continued to obtain prescription medications.

The ALJ observed during the administrative hearing that Plaintiff was able to participate closely and fully without being distracted or showing any overt pain behavior.

- 13 -

At various times, Plaintiff reported to medical providers that the oxycodone and morphine sulfate had decreased her pain and that she had no adverse effects from the pain medications.

Plaintiff testified that she quit her job as a cake decorator to work for a family medical supply company, but then quit the medical supply company because she was not getting paid.  When questioned by her attorney, Plaintiff said that if the medical supply company had not had problems paying her, she would have had to stop working there because of her knee and back problems.  The ALJ found no evidence of a significant deterioration in Plaintiff's medical condition since ending the medical supply work and therefore concluded that her medical condition would not prevent the performance of that job.

Therefore, substantial evidence supports finding that the ALJ provided clear and convincing reasons for discrediting Plaintiff's subjective symptom testimony.  *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 693 (9th Cir. 2009).

**C.     The ALJ Did Not Err in Weighing a Third-Party Report by Mary Isch.**

In a third-party function report dated February 10, 2012, Plaintiff's friend, Mary Isch, stated that Plaintiff visits Ms. Isch at her home "when able," "tries to clean her apartment when able," goes outside "when able," drives a car "when able," watches television "when able," talks on the phone daily "when physically able to," and goes to church "when able."  Ms. Isch said that she visits with Plaintiff three or four times a week during which they talk and watch television, and Plaintiff watches television with family and friends.  She said that Plaintiff and her grandmother live together and take care of each other.  She said that Plaintiff needs help to get dressed, bathe, care for hair, and use the toilet.  Ms. Isch also said Plaintiff prepares frozen dinners daily, and it takes one and a half hours for Plaintiff to do so.  She said that Plaintiff does not take care of pets, but her daughter helps care for the pets when she is home.  According to Ms. Isch, Plaintiff is unable to do household chores or yard work due to mobility, is unable to do chores within a timely manner, and needs "someone to help with everything."  Ms. Isch said that

- 14 -

Plaintiff cannot go out alone because she needs help getting around and shops in stores with help for food and personal items.  She indicated that Plaintiff's conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, completing tasks, using hands, and getting along with others.  Ms. Isch said Plaintiff can lift 5 – 10 pounds, walk 50 – 100 feet, and stand 2 – 5 minutes.  Ms. Isch indicated that Plaintiff was prescribed and uses a walker and a cane all of the time.

Ms. Isch also indicated that Plaintiff's conditions do not affect talking, hearing, memory, concentration, understanding, and following instructions.  Ms. Isch opined that Plaintiff can pay bills, handle a savings account, count change, and use a checkbook/ money orders.  She also stated that Plaintiff does not handle stress or changes in routine well.

Plaintiff contends that the ALJ committed legal error by finding the third-party function report partially credible and entitled to "some weight" without stating which portion of the opinion is credited and what portion is rejected.  However, after stating that he had considered the third-party function report, the ALJ's hearing decision appears to restate the portion he found to be credible, *i.e.*, that Plaintiff "prepares her own meals, drives, goes shopping in stores and watches television with others."

Plaintiff also contends the ALJ erred by failing to give specific reasons for finding the third-party function report only partially credible.  *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 693-94 (9th Cir. 2009) (when discounting the testimony of lay witnesses, the ALJ must give reasons that are germane to each witness).  The ALJ's brief discussion of the third-party function report is included near the end of a lengthy analysis of all of the evidence he considered in making the residual functional capacity determination, after which he concluded that "the residual functional capacity is supported by the objective medical evidence, the evidence related to the claimant's credibility and the opinion evidence."  If the ALJ was required to say more, failure to do so is harmless error.

1    Harmless error principles apply in the Social Security Act context.  *Molina v.*
2    *Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  An error is harmless if there remains
3    substantial evidence supporting the ALJ's decision and the error does not affect the
4    ultimate nondisability determination.  *Id.*  The claimant usually bears the burden of
5    showing that an error is harmful.  *Id.* at 1111.

6    Much of the third-party function report does not state what Plaintiff is able to do,
7    only that she does certain things "when able."  Further, it is contradictory in part and
8    refuted by other evidence of record in other parts.  For example, it states that Plaintiff and
9    her grandmother "take care of each other," but Plaintiff needs "someone to help with
10   everything."  She is unable to do household chores, but also she is unable to do chores
11   within a timely manner.  More significant, however, is the fact that the residual functional
12   capacity includes limitations consistent with many of Ms. Isch's opinions, such as
13   postural limitations, lifting less than 10 pounds, and "work in a low-stress job, described
14   as having only occasional changes in the work setting."  Even if the ALJ's failure to say
15   more about the third-party function report was error, Plaintiff has not shown that is
16   harmful.

17          **D.    The ALJ Did Not Err by Failing to Set Forth a Function-by-Function**
18               **Assessment of Residual Capacity.**

19   Plaintiff contends the ALJ erred by finding that Plaintiff has the residual
20   functional capacity to perform "sedentary work" without specifically finding the length
21   of time she can sit, stand, or walk; the amount of weight she can lift and carry in a work
22   setting; and limitations related to napping during the day, maintaining concentration, and
23   responding to changes in the work setting.

24          A claimant's residual functional capacity is "what an individual can still do despite
25   his or her limitations."  Social Security Ruling 96-8p.  The residual functional capacity
26   determination is "a function-by-function assessment based upon all of the relevant
27   evidence of an individual's ability to do work-related activities."  *Id.*

28

The ALJ expressly incorporated functional limitations by identifying "sedentary work" as "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)." "Sedentary work" is defined as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and requiring primarily sitting with only occasional walking and standing.

Regarding exertional categories, such as "sedentary," Social Security Ruling 96-8p explains:

> At step 4 of the sequential evaluation process, the [residual functional capacity] must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.
>
> [Residual functional capacity] may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.
>
> At step 5 of the sequential evaluation process, [residual functional capacity] must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do. However, in order for an individual to do a full range of work at a given level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is

1
2
> appropriate and whether the individual is capable of doing the
> full range of work contemplated by the exertional level.

3  Social Security Ruling 96-8p.

4          Thus, the ALJ was required to provide a function-by-function assessment of

5  Plaintiff's residual functional capacity only if he concluded at step 4 that she could

6  perform past relevant work or at step 5 that she could perform the full range of sedentary

7  work.  But the ALJ concluded at step 4 that Plaintiff cannot perform past relevant work

8  and at step 5 found that she cannot perform the full range of sedentary work.  The ALJ

9  expressly found that Plaintiff can never climb ladders, ropes, and scaffolds; can only

10  occasionally climb ramps and stairs; can only occasionally stoop and crouch; can never

11  kneel and crawl; is limited to performing simple, unskilled work; and is limited to "work

12  in a low-stress job, described as having only occasional changes in the work setting."

13  The ALJ did not include a sit/stand option in the residual functional capacity because he

14  did not give significant weight to Dr. Kidane's opinion that Plaintiff must alternate

15  between sitting, standing, and walking every 1 – 20 minutes with 15+ minutes of rest

16  with position changes, *i.e.*, she must spend at least half of the time resting.  Similarly, he

17  did not include manipulative limitations because he did not give significant weight to

18  Dr. Kidane's opinion that Plaintiff is able to use only her left foot frequently.

19          Therefore, the ALJ did not err by failing to set forth a function-by-function

20  assessment of residual capacity.

21          IT IS THEREFORE ORDERED that the final decision of the Commissioner of

22  Social Security is affirmed.  The Clerk shall enter judgment accordingly and shall

23  terminate this case.

24          Dated this 13th day of May, 2014.

25
26          _____
27                   Neil V. Wake
28          United States District Judge